**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

————————————————————— x

Almany Ismael Bangoura, individually and on
behalf of all others similarly situated,

                 Plaintiff,

v.

Beiersdorf, Inc. and Bayer Healthcare, LLC,

                 Defendants.

————————————————————— x

Case No. 1:22-cv-00291-BMC

**SECOND AMENDED CLASS**
**ACTION COMPLAINT**

**<u>JURY TRIAL DEMANDED</u>**

       Plaintiff Almany Ismael Bangoura (hereinafter "Plaintiff"), individually and on behalf of all others similarly situated, by his attorneys, alleges the following upon information and belief, except for those allegations pertaining to Plaintiff, which are based on personal knowledge:

<u>**NATURE OF THE ACTION**</u>

       1.    This action seeks to remedy the deceptive and misleading business practices of Beiersdorf, Inc. and Bayer Healthcare, LLC (hereinafter collectively "Defendants") with respect to the marketing and sale of Defendants' Coppertone sunscreen line of products throughout the country, including, but not limited to, the following products (hereinafter collectively the "Products"):

- Coppertone Defend and Care Whipped Ultra Hydrate SPF 50;

- Coppertone Pure & Simple Spray SPF 50;

- Coppertone Pure & Simple Kids Spray SPF 50;

- Coppertone Pure & Simple Baby Spray SPF 50;

- Coppertone Sport Mineral Spray SPF 50; and

- Coppertone Sport Spray SPF 50 (Travel-size).

2.      Defendants have improperly, deceptively, and misleadingly labeled and marketed its Products to reasonable consumers, like Plaintiff, by labeling, touting, and marketing its Products as being healthy, safe, pure, and simple while knowing (but omitting and not disclosing to consumers on its packaging) that the Products contain benzene (or at the very least that they are at the risk of containing benzene).  Benzene is a harmful chemical, and exposure to it carries a real risk of adverse health impacts including leukemia and other cancers of the blood cells.

3.      Despite these representations and despite specifically listing both the active and inactive ingredients of these Products on the label, Defendants fail to disclose that the Products contain or at the risk of containing "benzene"

4.      A representative example of Defendant's lack of disclosure can be seen below[1]:

---

[1] https://www.coppertone.com/products/coppertone-pure-and-simple-spf50-sunscreen-spray-0004601.html





5.      Benzene is a widely recognized and incredibly dangerous substance, especially in

the context of applying it to the skin, and it offers no therapeutic sunscreen benefit whatsoever.

Rather, it is a harmful carcinogen.

6.      Benzene has been recognized, acknowledged, and accepted as a well-known health hazard and human carcinogen for approximately a century.[2]

7.       For example, Benzene is known to harm the bone marrow and continued exposure can lead to blood cancer, such as leukemia.[3]

8.      Consumers like the Plaintiff trust manufacturers such as Defendants to sell products that are safe and free from harmful known toxins and carcinogens, including benzene.

9.      Plaintiff and those similarly situated (hereinafter "Class Members") certainly expect that the sunscreen they purchase will comply with its labeling and not contain or risk containing any knowingly harmful substances or carcinogens like benzene.

10.     Defendants' specifically manufacture, sell, and distribute the Products in this manner using a marketing and advertising campaign centered around claims that appeal to health-conscious consumers looking to purchase products that are healthy, safe, pure, and simple as Defendants represented these products were.

11.     Defendants tout their Products as being safe and healthy.  For example, Defendants state on the front of the bottle that their Coppertone Sport Mineral Spray SPF 50 Product is "100% Naturally Sourced Zinc Oxide."[4] This statement would lead reasonable consumers to believe that the Product was safe, natural, and healthy and that it contains safe and natural ingredients when, in fact, the Product was contaminated or was at risk of being contaminated with benzene.

---

[2]      James Huff, *Benzene-induced cancers; abridge history and occupational health impact*, 13 Int'l J. Occupational and Env't Health 213 (2007), https://pubmed.ncbi.nlm.nih.gov/17718179/.

[3]      *Facts About Benzene,* CENTERS FOR DISEASE CONTROL AND PREVENTION, https://emergency.cdc.gov/agent/benzene/basics/facts.asp (last visited Nov. 23, 2021).

[4] https://www.coppertone.com/products/coppertone-sport-mineral-sunscreen-spray-spf50-0004201.html



12.    Defendants also state on three of their Products, two of which are aimed at kids and babies, that the Products are "Pure & Simple."







13.     In a further effort to convey to consumers that their Products are safe and healthy, Defendants state on the front label that the Products are "FREE OF oxybenzone, octinoxate, PABA, parabens, dyes, fragrance" or "No Dyes, PABA."

14.     Defendants' statements would lead a reasonable consumer to believe that the Products are safe and free from hazardous ingredients and contaminants such as benzene.

15.     Defendants are using a marketing and advertising campaign centered on claims that appeal to health-conscious consumers and parents.  These statements lead a reasonable consumer to believe they are purchasing safe and healthy products when in fact they are purchasing products contaminated with benzene.

16.     Defendants' marketing and advertising campaign includes the one place that every consumer looks when purchasing a product – the packaging and labels themselves.  As such, a reasonable consumer reviewing Defendants' labels reasonably believes that they are purchasing a product that is safe for them and their children.  Indeed, consumers expect the ingredient listing on the packaging and labels to accurately disclose the ingredients within the Products.  Thus, reasonable consumers would not think that Defendants are omitting the fact that the Products contain or are the risk of containing benzene.

17.     Defendants' advertising and marketing campaign is false, deceptive, and misleading because the Products do contain or risk containing benzene which is dangerous to one's health and well-being and Defendants do not list or mention benzene anywhere on the Products' packaging or labeling.

18.     Plaintiff and Class Members relied on Defendants' misrepresentations and omissions of the safety of the Products and what is in the Products when they purchased them.

19.     Consequently, Plaintiff and Class Members lost the entire benefit of their bargain when what they received was a sunscreen product contaminated with a known carcinogen.

20.     That is because Defendants' Products containing, or at risk of containing, a known human carcinogen have no value.

21.     As set forth below, sunscreen products, such as Defendants' Products, that contain benzene are in no way safe for humans and are entirely worthless.

22.     Alternatively, Plaintiff and Class Members paid a price premium for the Products based upon Defendants' health-conscious marketing and advertising campaign including their false and misleading representations and omission on the Products' labels.  Given that Plaintiff and Class Members paid a premium for the Products, Plaintiff and Class Members suffered an injury in the amount of the premium paid.

23.     Accordingly, Defendants' conduct violated and continues to violate, *inter alia*, New York General Business Law §§349 and 350.  Defendants also breached and continue to breach their warranties regarding the Products.

24.     Plaintiff brings this action against Defendants on behalf of himself and Class Members who purchased the Products during the applicable statute of limitations period (the "Class Period").

## FACTUAL BACKGROUND

25.     Sunscreen, also known as sunblock or suntan lotion, is a product Defendants market, advertise, and sell to provide protection against the sun's ultraviolet (UV) rays or radiation.

26.     Sunscreens are categorized according to their mechanism of action. There are physical sunscreens which stay on the surface of the skin and deflect the UV rays or light and chemical sunscreens which absorb the UV light.

27.     Since 1974, sunscreens are assigned a Sun Protection Factor ("SPF") which measures the fraction of harmful UV rays or radiation that reach the skin.  For example, the SPF number tells you how long the sun's UV radiation would take to redden your skin when using the product exactly as directed versus the amount of time without any sunscreen.  So ideally, using a

product with SPF 30 would take you 30 times longer to burn than if you weren't wearing sunscreen. A product with SPF 30 allows about 3 percent of UVB rays to hit your skin. A product with SPF of 50 allows about 2 percent of those rays through. That may seem like a small difference until you realize that the product with SPF 30 is allowing 50 percent more UV radiation onto your skin than the product with SPF 50.

28.    After initial application to the skin, sunscreens must be reapplied often, typically every 2-3 hours, to continue to protect the skin from UV radiation or rays.

29.    The most common active ingredients in sunscreen products sold in the United States include avobenzone, homosalate, octinoxate, octisalate, octocylene, oxybenzone, titanium dioxide, and zinc oxide.

30.    Sales of sun care products including sun tan lotions, sprays, and gels have steadily increased as consumers have become more vigilant and health conscious in terms of protecting their skin from the exposure to UV rays or radiation which can cause sunburn and increases the risk for skin cancer. As of 2016, the estimated market size of the sun care market was $1.95 billion.[5]

31.    Consumers have become increasingly concerned about the effects of synthetic and chemical ingredients in products that they and their family members put on and/or into their bodies. Companies such as Defendants have capitalized on consumers' desire for healthy and safe products, and indeed, consumers are willing to pay, and have paid, a premium for these products.

32.    Consumers lack the meaningful ability to test or independently ascertain or verify whether a product contains unsafe substances, such as benzene, especially at the point of sale, and

---

[5]    *U.S. Sun Care Market Size, Share & Trends Analysis Report, By Product (Self-tanning, After sun, Sun protection), Competitive Landscape, And Segment Forecasts, 2018 – 2025*, GRAND VIEW RESEARCH (Apr. 2018), https://www.grandviewresearch.com/industry-analysis/us-sun-care-market.

therefore must and do rely on Defendants to truthfully and honestly report what the Products contain or are at risk of containing on the Products' packaging or labels.

33.    The Products' packaging does not identify benzene.  Indeed, benzene is not listed in the ingredients section, nor is there any warning about the inclusion (or even potential inclusion) of benzene in the Products.  This leads reasonable consumers to believe the Products do not contain and are not at risk of containing dangerous chemicals like benzene.

34.    However, despite the fact that the Products' labeling and ingredient listing do not list benzene, the Products contain or risk containing benzene.

35.    Twenty-first century research has confirmed that there is no safe level of benzene exposure.[6]

36.    Benzene has been recognized, acknowledged, and accepted as a well-known health hazard and human carcinogen for approximately a century.[7]

37.    The National Toxicology Program (hereinafter "NTP") has regarded benzene as "known to be a human carcinogen based on sufficient evidence of carcinogenicity from studies in humans."[8]

38.    The World Health Organization ("WHO") and the International Agency for research on Cancer ("IARC") have classified benzene as a Group 1 compound thereby defining it as "carcinogenic to humans."[9]

---

[6]    *Advances in Understanding Benzene Health Effects and Susceptibility*, 31 ANNUAL REVIEW OF PUBLIC HEALTH 133 (Apr. 21, 2010), https://www.annualreviews.org/doi/full/10.1146/annurev.publhealth.012809.103646.

[7]    *Supra* note 2.

[8]    *Benzene,* Report on Carcinogens, Fourteenth Edition, DEPT. OF HEALTH AND HUMAN SERVICES (Nov. 3, 2016), https://ntp.niehs.nih.gov/ntp/roc/content/profiles/benzene.pdf.

[9]    *Benzene*, IARC MONOGRAPHS ON THE EVALUATION OF CARCINOGENIC RISKS TO HUMANS, Volume 120 (2018), https://publications.iarc.fr/_publications/media/download/6043/20a78ade14e86cf076c3981a9a094f45da6d27cc.pdf.

39.    The National Institute for Occupational Safety and Health ("NIOSH") recommends protective equipment be worn by workers exposed or expecting to be exposed to benzene at concentrations of 0.1 ppm and defines "inhalation, skin absorption, ingestion, skin and/or eye contact" as exposure routes or paths.[10]

40.    Direct benzene exposure through the skin is particularly concerning.  For example, "[d]irect exposure of the eyes, skin, or lungs to benzene can cause tissue injury and irritation."[11]

41.    Research also has revealed that sunscreen ingredients can be absorbed through the skin into the bloodstream.[12]

42.    Moreover, a study by Health Canada's Bureau of Chemical Hazards concluded that "the application of sunscreen specifically increases the absorption rate of benzene through the skin," thereby increasing the risk of harm.[13]

43.    Even low levels of benzene are particularly dangerous in a sunscreen product because "[s]unscreen products are typically used in many times higher volume than standard drug products like tablets or capsules, so even a relatively low concentration limit can result in very high total [benzene] exposure."[14]

---

[10]    *NIOSH Pocket Guide to Chemical Hazards - Benzene*, THE NATIONAL INSTITUTE FOR OCCUPATIONAL SAFETY AND HEALTH (NIOSH), https://www.cdc.gov/niosh/npg/npgd0049.html (last visited Nov. 23, 2021).

[11]    *Supra* note 3.

[12]    Dr. Manavjeet Sidhu, *Sunscreen can be absorbed in the bloodstream, new study says*, ABCNews (Jan. 20, 2020, 8:30 AM), https://abcnews.go.com/Health/sunscreen-absorbed-bloodstream-testing-needed/story?id=68442221 (last visited Nov. 23, 2021).

[13]    *Valisure Detects Benzene in Sunscreen*, VALISURE BLOG (May 25, 2021), https://www.valisure.com/blog/valisure-news/valisure-detects-benzene-in-sunscreen/.

[14]    Letter from Valisure, LLC to the Food and Drug Administration, re: Valisure Citizen Petition on Benzene in Sunscreen and After-sun Care Products (May 24, 2021) (https://assets-global.website-files.com/6215052733f8bb8fea016220/62728f83d7f91acc8572e9ee_FDA-2021-P-0497-0001_attachment_1.pdf) at 16.

44.     Experts in the field of dermatology agree with this assessment.  For example, Christopher Bunick, a professor of dermatology at Yale University has stated:

> Considering that human skin has a large total surface area (~1.85 m2), and that ~28.5 g of sunscreen is needed per application to properly cover that skin surface, it follows then that there is not a safe level of benzene that can exist in sunscreen products. The total mass of sunscreen required to cover and protect the human body, in single daily application or repeated applications daily, means that even benzene at 0.1 ppm in a sunscreen could expose people to excessively high nanogram amounts of benzene.[15]

45.     FDA guidance provides that no level of benzene is safe, and benzene is not permitted in these types of sunscreen products.  The FDA currently recognizes the high danger of this compound and lists it as a "Class 1 solvent" that "should not be employed in the manufacture of drug substances, excipients, and drug products because of their unacceptable toxicity . . . . However, if their use is unavoidable in order to produce a drug product with a significant therapeutic advance, then their levels should be restricted" and benzene is restricted under such guidance to 2 parts per million("ppm").[16]

46.     Additionally, and not surprising, in the FDA's "list of acceptable active ingredients in products that are labeled as sunscreen," benzene is not listed among them.[17]

47.     For reference, the National Institute for Occupational Safety and Health ("NIOSH") recommends protective equipment be worn by workers expecting to be exposed to benzene at concentrations of 0.10 ppm and defines "skin absorption" as an exposure route.[18]

---

[15]     *Id.* at 17.

[16]     *Supra* note 12.

[17]     *Sunscreen: How to Help Protect Your Skin from the Sun,* FOOD AND DRUG ADMIN., https://www.fda.gov/drugs/understanding-over-counter-medicines/sunscreen-how-help-protect-your-skin-sun (last visited Nov. 23, 2021).

[18] NIOSH Pocket Guide to Chemical Hazards - Benzene, THE NATIONAL INSTITUTE FOR OCCUPATIONAL SAFETY AND HEALTH (NIOSH), https://www.cdc.gov/niosh/npg/npgd0049.html

48.    According to the World Health Organization, there is "no safe level of [benzene] exposure[.]"[19]

49.    This is why recent research revealing benzene in Defendants' Products is particularly concerning.

50.    Valisure, LLC (an analytical pharmacy, patient advocacy, and consumer protection organization) ("Valisure") recently published a study ("Study") that found benzene in 43 out of 234 sunscreens and in 8 out of 48 after-sun products.[20]

51.    Valisure found that Defendants' Products contained benzene through its own laboratory testing.[21]  Although the entire product line was not tested, benzene contamination was revealed through testing of the Coppertone Defend and Care Whipped Ultra Hydrate SPF 50 product.[22]

52.    After the Valisure Study, Defendant issued a voluntary recall ("Recall") of five additional Coppertone Products which Defendant identified contained benzene (Coppertone Pure & Simple Spray SPF 50, Coppertone Pure & Simple Kids SPF 50, Coppertone Pure & Simple Baby SPF 50, Coppertone Sport Mineral SPF 50, Coppertone Sport Spray SPF 50 (Travel-size).[23]

| PRODUCT | CONTAINS BENZENE |
|---|---|
| Coppertone Defend and Care Whipped Ultra Hydrate SPF 50 | ✔ |

---

[19]    Exposure to Benzene: A Major Public Health Concern, WORLD HEALTH ORG., (2010), https://www.who.int/ipcs/features/benzene.pdf

[20]    *Supra* note 12.

[21]    *Supra* note 13.

[22]    *Id*. at 13-15.

[23]    https://www.sunscreenrecall2021.com/

| | |
|---|---|
| Coppertone Pure & Simple Spray SPF 50 | ✓ |
| Coppertone Pure & Simple Kids SPF 50 | ✓ |
| Coppertone Pure & Simple Baby SPF 50 | ✓ |
| Coppertone Sport Mineral SPF 50 | ✓ |
| Coppertone Sport Spray SPF 50 (Travel-size) | ✓ |

53.    Moreover, because the majority of the products Valisure tested did not contain detectable levels of benzene, its use is not "unavoidable" in order to achieve the therapeutic benefits of sunscreen.

54.    It is well recognized even by Defendants and other manufacturers that benzene is not an active ingredient, [24] and can be eliminated from the products.

---

[24] Everything You Need to Know About the Recent Sunscreen Recalls, Birnur Aral, PH.D Good Housekeeping Institute and Zec Krstic, Aug 11, 2021 ("'It's not an ingredient that is added to sunscreen, and likely, [benzene in sunscreen] occurs as a contaminant, a byproduct of manufacturing, or in the production of another raw material [used in sunscreen], like alcohol or aloe vera,' explains Laura Cohen, M.D., a board-certified dermatologic surgeon serving as President and CEO of CoLabs International.' Benzene contamination may occur in many alcohol spray applications, and in some alcohol or aloe vera-based lotions'"). https://www.goodhousekeeping.com/beauty/anti-aging/a37273260/benzene-in sunscreen/#:~:text=%22It's%20not%20an%20ingredient%20that,certified%20dermatologic%20

55.    In fact, Defendants could avoid exposing Plaintiff and the Class to benzene in the manufacturing process and raw ingredients, and the Products could have been sold with absolutely no benzene in them.[25]

56.    Defendants knew or should have known that their Products contained, or were at risk of containing, benzene.

57.    Indeed, spray-on sunscreens, like Defendants' Products, contain butane (or isobutane which has the same composition as butane and is manufactured similarly) as an aerosol propellant in addition to the regular and standard sunscreen ingredients.  Defendants list butane or isobutane as an inactive ingredient in their Coppertone Pure & Simple Spray SPF 50, Coppertone Pure & Simple Kids Spray SPF 50, Coppertone Pure & Simple Baby Spray SPF 50, Coppertone Sport Mineral Spray SPF 50; and Coppertone Sport Spray SPF 50 (Travel-size) Products.

58.    Benzene and butane are known as "hydrocarbons," molecules comprised of carbon and hydrogen atoms.  Both are highly flammable and insoluble in water, but soluble with each other.[26]

59.    Aerosol propellants use volatile hydrocarbons as their base.  Propellants like butane or isobutane are derived from crude oil and manufactured in oil refineries where a variety of other hydrocarbons, including benzene, are produced.[27] Given that Defendants use butane as a propellant

---

[25] *See supra* note 13 at 2.

[26] *See* The Solution Process, https://www.chem.fsu.edu/chemlab/chm1046course/solnprocess.html; *see also* Centers for Disease Control and Prevention, *Facts About Benzene*,
https://emergency.cdc.gov/agent/benzene/basics/facts.asp#:~:text=Benzene%20is%20a%20chemical%20that,sink%20into%20low%2Dlying%20areas; Whiting, *Butane Safety Data Shee*t, https://whiting.com/wp-content/uploads/Butane-SDS.pdf

[27] *See* EPA Petroleum Refining Effluent Guidelines, https://www.epa.gov/eg/petroleum-refining-effluent-guidelines (explaining that petroleum refineries produce, *inter alia*, "[p]etrochemicals and petrochemical feedstocks—naphtha, ethane, propane, butane, ethylene, propylene, butylene, and BTEX compounds (benzene, toluene, ethylbenzene & xylene)").

in their Products, and it is produced in the same environment as benzene, they knew (or should have known) that their propellants contained (or were at risk of containing) benzene.

60.     Additionally, given that the manufacturing of butane is done in an environment where high levels of benzene exist, it is thus further likely that other hydrocarbon products could become contaminated with benzene.  Indeed, articles have reported the presence of benzene and benzene leaks at oil refineries throughout the country.  In fact, one article reported that "[o]ut of 129 operable oil refineries in 2021, 118 reported benzene concentration registered at or near the site[.]"[28]  Given that the propellants used in Defendants' Products are or may be produced in the same oil refineries as benzene, Defendants knew (or should have known) that their Products that use the propellants contained (or were at risk of containing) benzene.

61.     One chemical company, Whiting, knew and disclosed this very fact in their Safety Data Sheet (SDS) for their butane product on June 24, 2011.  Whiting's SDS conspicuously states on the first page that their butane product may contain benzene.[29]



**2. Hazard Identification**

Butane is a colorless gas having no odor.  It is extremely flammable and explosive.  Keep away from heat, sparks, and open flame.   At high concentrations this product acts as a simple asphyxiant.

Large pressure drops in a butane process could result in temperatures low enough to cause frost bite.

**DANGER!**
**FLAMMABLE LIQUEFIED GAS**

LIQUEFIED GAS UNDER PRESSURE. MAY EXPLODE IF HEATED. PRODUCES SKIN IRRITATION UPON PROLONGED OR REPEATED SKIN CONTACT.  MAY CONTAIN TRACE AMOUNTS OF BENZENE WHICH CAN CAUSE CANCER OR BE TOXIC TO BLOOD-FORMING ORGANS. MAY BECOME ASPHYXIANT IF RELEASED. UPON SUDDEN RELEASE OF PRESSURE, CAN CAUSE FROSTBITE WHEN IN CONTACT WITH SKIN.

**NO SMOKING!**
**KEEP AWAY FROM HEAT/SPARKS/OPEN FLAMES/HOT SURFACES. WEAR PROTECTIVE GLOVES, CLOTHING AND EYE WEAR WHEN HANDLING.**

---

[28] The Guardian, *US oil refineries spewing  cancer-causing benzne into communities, report finds*, https://www.theguardian.com/environment/2022/may/12/us-oil-reefineries-benzene-pollution-cancer-causing
[29] https://whiting.com/wp-content/uploads/Butane-SDS.pdf

62.    Accordingly, producers of butane knew and warned that butane may contain benzene.  Defendants knew (or should have known) that in using aerosol propellants like butane in their sunscreen Products that the Products contained (or were at risk of containing) benzene.

63.    Indeed, Valisure data shows that propellant-containing spray-on sunscreens contained the most amount of benzene.[30]

64.    Likewise, Coppertone Defend and Care Whipped Ultra Hydrate SPF 50 contains ingredients which can produce benzene as a byproduct in the final product.  Defendants' Coppertone Defend and Care Whipped Ultra Hydrate SPF 50 Product contains alcohols, as listed in its inactive ingredients, the production of which could result in benzene contamination.  Indeed, experts have noted that benzene in sunscreen likely "occurs as a contaminant, a byproduct of manufacturing, or in the production of another raw material [used in sunscreen], like alcohol or aloe vera."[31]

65.    Valisure's testing as described above demonstrated that the Coppertone Defend and Care Whipped Ultra Hydrate SPF 50 product contained benzene.

66.    Valisure investigated the possibility that benzene occurred due to the natural degradation of sunscreen's active ingredients and determined that it did not.  Thus, the presence of benzene in the sunscreen products is likely due to contamination during the manufacturing process.[32]

---

[30] *See supra* note 13 at 12-15.

[31] Everything You Need to Know About the Recent Sunscreen Recalls, Birnur Aral, PH.D Good Housekeeping Institute and Zec Krstic, Aug 11, 2021 ("'It's not an ingredient that is added to sunscreen, and likely, [benzene in sunscreen] occurs as a contaminant, a byproduct of manufacturing, or in the production of another raw material [used in sunscreen], like alcohol or aloe vera,' explains Laura Cohen, M.D., a board-certified dermatologic surgeon serving as President and CEO of CoLabs International. 'Benzene contamination may occur in many alcohol spray applications, and in some alcohol or aloe vera-based lotions'"). https://www.goodhousekeeping.com/beauty/anti-aging/a37273260/benzene-in sunscreen/#:~:text=%22It's%20not%20an%20ingredient%20that,certified%20dermatologic%20

[32] *See supra* note 13. at 7-8.

67.     Defendants are large and sophisticated corporations that have been in the business of producing, manufacturing, selling, and distributing sunscreen products for many years, including producing and manufacturing sunscreen products that utilize and contain aerosol propellants and other raw materials that involve a risk of benzene contamination.

68.     Defendants are in the unique and superior position of knowing the ingredients and raw materials used in the manufacturing of their Products and possess unique and superior knowledge regarding the manufacturing process of the Products, the manufacturing process of the ingredients and raw materials the Products contain, and the risks associated with those processes, such as the risk of benzene contamination.

69.     Accordingly, Defendants possess superior knowledge regarding the risks involved in the production and manufacturing of their Products.  Such knowledge is not readily available to consumers like Plaintiff and Class Members.

70.     Defendants have a duty to provide consumers, like Plaintiff and Class Members, with accurate information about the contents of the Products.

71.     Consumers lack the meaningful ability to test or independently ascertain or verify whether a product contains unsafe substances, such as benzene, especially at the point of sale, and therefore must and do rely on Defendants to truthfully and honestly report what the Products contain or are at risk of containing on the Products' packaging or labels.

72.     Therefore, Defendants' false, misleading, and deceptive misrepresentations regarding the health and safety of the Products and the omissions regarding the ingredients of the Products are likely to continue to deceive and mislead reasonable consumers and the public, as they have already deceived and misled Plaintiff and the Class Members.

73.     Defendants' misrepresentation and omission was material and intentional because people are concerned with what is in the products that they are putting onto and into their bodies. Consumers such as Plaintiff and the Class Members are influenced by the marketing and advertising campaign, the Product labels, and the listed ingredients.  Defendants know that if they had not omitted that the Products contained benzene, then Plaintiff and the Class would not have purchased the Products at all.

i.      **Defendants' Products are also adulterated, misbranded and/or are unapproved new drugs in violation of Federal Food, Drug and Cosmetic Act and its regulations**

74.     Defendants' Products are also adulterated, misbranded, and/or constitute unapproved new drugs, in violation of federal and state law, rendering them worthless.

75.     Plaintiff brings claims under various state consumer and warranty theories and are not seeking to enforce any federal statute or regulation; however, much of the conduct giving rise to Plaintiff's claims was likewise in violation of the Federal Food, Drug, and Cosmetics Act, 21 U.S.C. § 301, *et seq*. ("FFDCA") and its implementing regulations.

76.     Most sunscreens, including the Products, are considered drugs that are regulated by the U.S. Food and Drug Administration ("FDA").

77.     They are therefore subject to the FFDCA and its implementing regulations.  These include, *inter alia*, the FFDCA's provisions regarding misbranded drugs, adulterated drugs, and nonprescription over-the-counter ("OTC") drugs that may be marketed without an approved drug application.  21 U.S.C. §§ 351, 352, 355h.

78.     Under the FFDCA and its implementing regulations, Defendants' Products constitute misbranded drugs, adulterated drugs, and/or unapproved new drugs that do not meet the general requirements for nonprescription drugs to be marketed without an approved application.

79.     The manufacture of any misbranded or adulterated drug is prohibited under federal law.  21 U.S.C § 331(g).

80.     The introduction or delivery for introduction into interstate commerce (or receipt thereof) of any misbranded or adulterated drug is prohibited under federal law.  21 U.S.C. § 331(a), (c).

81.     Further, the introduction or delivery for introduction into interstate commerce of a purported nonprescription OTC drug that fails to meet the OTC drug requirements is prohibited under federal law.  21 U.S.C §§ 355(a) and 331(d).

82.     Defendants' Products are 'misbranded' under 21 U.S.C. § 352 and the relevant regulations.

83.     21 U.S.C. § 352(a)(1) provides that a drug shall be deemed to be misbranded under the FFDCA if, *inter alia,* if "its labeling is false or misleading in any particular."

84.     Further, "[i]f an article is alleged to be misbranded because the labeling…is misleading, then in determining whether the labeling…is misleading there shall be taken into account (among other things) not only representations made or suggested by statement [or] word,…but also the extent to which the labeling…fails to reveal facts material in the light of such representations or material with respect to consequences which may result from the use of the article…under such conditions of use as are customary or usual." 21 U.S.C. § 321(n).

85.     Here, Defendants have violated 21 U.S.C. § 352(a)(1) rendering the Products "misbranded."

86.     The Products' labeling (in the ingredients list or otherwise) fails to reveal that the Products contain or may contain benzene.  The absence of this disclosure conveys that benzene is

not in the Products, but independent third-party testing and Defendants' own Recall confirm that is not true.

87.    The omission that the Products contain or may contain a dangerous carcinogen is a material fact for any consumer item, and especially so for a product that is purchased for the purposes of promoting health and preventing cancer, and is to be used liberally and reapplied often.

88.    Exposure or potential exposure to carcinogens is even more material given that other products which offer the same protection are carcinogen-free.

89.    21 U.S.C. § 352(e)(1)(A)(iii) provides that a drug is also misbranded under the FFDCA "[i]f it is a drug, unless its label bears [, *inter alia*,] the established name of each inactive ingredient listed in alphabetical order on the outside container of the retail package."[33]

90.    The regulations similarly provide, as part of the label's content requirements, that the label discloses the "'inactive ingredients' followed by a listing of the established name of each inactive ingredient." 21 C.F.R. § 201.66(c)(8).

91.    Further, a substance that is present in some, but not all, bottles of a drug product should still be listed as an "inactive ingredient" if a manufacturer were to, as here, use a uniform ingredients list.

92.    Upon information and reasonable belief, benzene is not an "active ingredient" in Defendants' Products as it does not (nor could it be intended to) provide protection from UV rays. Nor is benzene on the FDA's list of approved active ingredients for sunscreen products.

93.    Benzene is therefore an inactive ingredient, yet Defendants unlawfully omitted it as such on the Products' labels.  Defendants should have included benzene in the "inactive ingredients" panel, with or without a "may contain this ingredient" asterisk, as appropriate.

---

[33] The FFDCA requires a label to list, *inter alia*, "the established name and quantity of…each active ingredient" as well as "the established name of each inactive ingredient[.]" 21 U.S.C. § 352(e)(ii), (iii).

94.    Alternatively, even if benzene were not required to be listed as an inactive ingredient, 21 U.S.C. § 352(j) provides that a drug is also misbranded under the FFDCA if "it is dangerous to health when used in the dosage or manner, or with the frequency or duration prescribed, recommended, or suggested in the labeling thereof."

95.    As described herein, consumer use of sunscreen has grown steadily.  Further, sunscreen products typically instruct users to apply sunscreen liberally and reapply often.

96.    Further, "recent studies by FDA researchers have shown that significant amounts of sunscreen ingredients absorb through the skin and are found in the blood; specifically, over 400 times the threshold for systemic carcinogenicity assessment for at least one sunscreen active ingredient."[34]

97.    Given that the Products are to be applied liberally and frequently, and given that carcinogen-free sunscreens exist offering the same therapeutic benefit, utilizing a sunscreen containing benzene creates a completely avoidable and unreasonable risk, and is dangerous to one's health.

98.    This is consistent with FDA's approach to the use of benzene in drug manufacturing.  Recognizing benzene's industrial use as a solvent, FDA has advised drug manufacturers to avoid using benzene, which it classifies as a "known human carcinogen" and "Class 1 solvent…to be avoided[.]"

99.    In its non-binding guidance as to residual solvents (solvents that remain as impurities in finished drug products), FDA explains:

## IV. LIMITS OF RESIDUAL SOLVENTS

### A. Solvents to Be Avoided

---

[34] May 24, 2021, Valisure Citizens Petition, at pg. 2, avail. At https://www.valisure.com/wpcontent/uploads/Valisure-Citizen-Petition-on-Benzene-in-Sunscreen-and-After-sun-Care-Products-v9.7.pdf. (see pg. 2).

> Solvents in Class 1 (Table 1; see companion document) should not be employed in the manufacture of drug substances, excipients, and drug products because of their unacceptable toxicity or their deleterious environmental effect. However, if their use is unavoidable in order to produce a drug product with a significant therapeutic advance, then their levels should be restricted as shown in Table 1, unless otherwise justified

FDA, Guidance for Industry: Q3C Impurities: Residual Solvents (Dec. 1997), available at https://www.fda.gov/media/71736/download, at 6 (emphasis in original).

100.    Insofar as the benzene in Defendants' Products was intentionally utilized or was a residual solvent impurity (since its use was not unavoidable), its presence at any level presents an unacceptable toxicity, rendering the Products dangerous.

101.    Accordingly, the Products are 'misbranded' under the FFDCA.

102.    In addition to (or in the alternative to) being "misbranded" under 21 U.S.C. § 352, Defendant's Products are "adulterated" under 21 U.S.C. § 351 and related regulations.

103.    21 U.S.C. § 351(a)(1) provides that a drug shall deemed to be adulterated under the FFDCA if, *inter alia,* "it consists in whole or in part of any filthy, putrid, or decomposed substance[.]"

104.    Defendants' Products consist in part of benzene, insofar as the benzene exists as an impurity or contaminant (rather than an intentional ingredient), its presence in the Products exists as a filthy, putrid, and/or decomposed substance.

105.    21 U.S.C. § 351(a)(2)(A) provides that a drug is also adulterated under the FFDCA "if it has been prepared, packed, or held under insanitary conditions…whereby it may have been rendered injurious to health[.]" Similarly, a drug is also adulterated "if its container is composed, in whole or in part, of any poisonous or deleterious substance which may render the contents injurious to health[.]" 21 U.S.C. § 351(a)(3).

106.    If it is the case that the benzene in Defendant's Products was not added intentionally to the sunscreen formulation, it follows that the benzene exists due to either contamination or the failure to remove impurities.

107.    With respect to potential contamination, the undisputed discovery of benzene in Defendants' Products (if not intentional) evidences that the Products were either manufactured, packaged, or stored under conditions where they, at the very least, may have been rendered injurious to health.  This renders the Products adulterated, regardless of whether those conditions resulted in benzene contamination in every single product bottle.

108.    Alternatively, if the presence of benzene is that of an impurity (left over after its use as a solvent during the manufacturing process), the mere decision to utilize benzene (as opposed to other equally effective, less harmful, and non-carcinogenic chemicals) amounts to preparing the Products in a way whereby they may be rendered injurious to health.

109.    In the further alternative, even if the decision of Defendants or one of their agents to utilize benzene as a solvent does not amount to preparing the sunscreen in a way potentially rendering in injurious to health, the failure to utilize adequate procedures to remove impurities during the manufacturing process amounts to precisely that.

110.    21 U.S.C. § 351(a)(2)(B) provides that a drug is also adulterated under the FFDCA if "the methods used in, or the facilities or controls used for, its manufacture, processing, packing, or holding do not conform to or are not operated or administered in conformity with current good manufacturing practice to assure that such drug…has the identity and strength, and meets the quality and purity characteristics, which it purports or is represented to possess[.]" Indeed, "[t]he failure to comply with any regulation set forth in [Parts 210 and 211] in the manufacture,

processing, packing, or holding of a drug shall render such drug to be adulterated under [21 U.S.C. § 351(a)(2)(B)]." 21 C.F.R. § 210.1(b).

111.    Insofar as benzene (a harmful carcinogen) made its way into Defendants' Products by accident, it follows that it was due to poor manufacturing processes by either Defendants and/or their agents.  Further evidencing this fact, Defendants and its competitors that have issued recalls following Valisure's testing of their products have announced they are investigating how exactly the benzene contamination may have occurred, and they acknowledge that it should not have happened.

112.    Accordingly, the Products are 'adulterated' under the FFDCA.

113.    In addition to (or in the alternative) to being "misbranded" and/or "adulterated" under 21 U.S.C. §§ 351-352, Defendants' Products are an unapproved new drug marketed in violation of 21 U.S.C. §§ 331(d) and 355(a) because the Products fail to satisfy the conditions required for bringing a new OTC drug to market without applying for FDA approval.  *See* 21 C.F.R. § 330.1; 21 C.F.R. §§ 330.1(a), (c)(1), (e), (f);

## JURISDICTION AND VENUE

114.    This Court has subject matter jurisdiction under the Class Action Fairness Act, 28 U.S.C. section §1332(d) in that (1) this is a class action involving more than 100 class members; (2) Plaintiff is a citizen of New York, Defendant Beiersdorf, Inc. is a citizen of Connecticut, and Defendant Bayer HealthCare, LLC is a citizen of New Jersey; and (3) the amount in controversy is in excess of $5,000,000, exclusive of interests and costs.

115.    This Court has personal jurisdiction over Defendants because Defendants conduct and transact business in the state of New York, contract to supply goods within the state of New York, and supply goods within the state of New York.

116.    Venue is proper because Plaintiff and many Class Members reside in the Eastern District of New York, and throughout the state of New York.  A substantial part of the events or omissions giving rise to the Classes' claims occurred in this district.

## PARTIES

### Plaintiff

117.    Plaintiff Almany Ismael Bangoura is a citizen and resident of the state of New York. During the applicable statute of limitations period, Plaintiff purchased and used Defendants' Products that contained benzene, including Products that were subject to the recall.  More specifically, during the class period Plaintiff purchased Defendants' Coppertone Defend and Care Whipped Ultra Hydrate SPF 50, Coppertone Pure & Simple SPF 50, and Coppertone Sport Mineral Spray SPF 50 products at various retail stores in New York.

118.    Had Defendants not made the false, misleading, and deceptive representations and omissions regarding the Products containing benzene, Plaintiff would not have been willing to purchase the Products.  Plaintiff purchased, purchased more of, and/or paid more for, the Products than he would have had he known the truth about the Products.  The Products Plaintiff received were worthless because they contain the known carcinogen benzene.  Alternatively, Plaintiff paid a price premium based on Defendant's false, misleading, and deceptive misrepresentations and omissions.  Accordingly, Plaintiff was injured in fact and lost money as a result of Defendants' improper conduct.

### Defendants

119.    Defendant, Beiersdorf, Inc., is a domestic corporation with its headquarters and principal place of business located in Wilton, Connecticut.  Beiersdorf, Inc. conducts business throughout the United States, including this district.  Beiersdorf, Inc. distributes the Products

throughout the United States.   Beiersdorf, Inc. purchased the Coppertone line of products, including the Products, from Bayer HealthCare, LLC in approximately September 2019. Beiersdorf, Inc.'s line of sunscreen products, including the Products purchased by Plaintiff and Class Members, are available at retail stores throughout New York and the United States. Defendant created and/or authorized the false, misleading, and deceptive manufacturing, marketing, advertising, and distributing of the Products.

120.    Defendant, Bayer HealthCare, LLC, is a domestic corporation with its headquarters and principal place of business located in Whippany, New Jersey.   Bayer HealthCare, LLC conducts business throughout the United States, including this district.   From approximately 2014 until September 2019, Defendant distributed the Products and created and/or authorized the false, misleading, and deceptive manufacturing, marketing, advertising, and distributing of the Products.

## CLASS ALLEGATIONS

121.    Plaintiff brings this matter on behalf of himself and those similarly situated.   As detailed at length in this Amended Complaint, Defendants orchestrated deceptive marketing and labeling practices.   Defendants' customers were uniformly impacted by and exposed to this misconduct.   Accordingly, this Amended Complaint is uniquely situated for class-wide resolution.

122.    The Class is defined as all consumers who purchased the Products anywhere in the United States during the Class Period.

123.    Plaintiff also seeks certification, to the extent necessary or appropriate, of a subclass of individuals who purchased the Products in the state of New York at any time during the Class Period (the "New York Subclass").

124.    The Class and New York Subclass shall be referred to collectively throughout the Amended Complaint as the Class.

125.    The Class is properly brought and should be maintained as a class action under Rule 23(a), satisfying the class action prerequisites of numerosity, commonality, typicality, and adequacy because:

126.    <u>Numerosity</u>: Class Members are so numerous that joinder of all members is impracticable.  Plaintiff believes that there are thousands of consumers in the Class and the New York Class who are Class Members as described above who have been damaged by Defendants' deceptive and misleading practices.

127.    <u>Commonality</u>: The questions of law and fact common to the Class Members predominate over any questions which may affect individual Class Members and include, but are not limited to:

a.    whether Defendants are responsible for the conduct alleged herein, which was uniformly directed at all consumers who purchased the Products;

b.    whether Defendants' misconduct set forth in this Amended Complaint demonstrates that Defendants have engaged in unfair, fraudulent, or unlawful business practices with respect to the advertising, marketing, and sale of their Products;

c.    whether Defendants made false and/or misleading statements and omissions to the Class and the public concerning the contents of their Products;

d.    whether Defendants' false and misleading statements and omissions concerning their Products were likely to deceive the public; and

e.    whether Plaintiff and the Class are entitled to money damages under the same causes of action as the other Class Members?

128.    <u>Typicality</u>: Plaintiff is a member of the Class.  Plaintiff's claims are typical of the claims of each Class Member in that every member of the Class was susceptible to the same deceptive and misleading conduct and purchased Defendants' Products.  Plaintiff is entitled to relief under the same causes of action as the other Class Members.

129.    <u>Adequacy</u>: Plaintiff is an adequate Class representative because his interests do not conflict with the interests of the Class Members he seeks to represent, his consumer fraud claims are common to all members of the Class, he has a strong interest in vindicating his rights, he has retained counsel competent and experienced in complex class action litigation, and counsel intends to vigorously prosecute this action.

130.    <u>Predominance</u>: Pursuant to Rule 23(b)(3), common issues of law and fact identified above predominate over any other questions affecting only individual members of the Class.  The Class issues fully predominate over any individual issues because no inquiry into individual conduct is necessary; all that is required is a narrow focus on Defendants' deceptive and misleading marketing and labeling practices.

131.    <u>Superiority</u>: A class action is superior to the other available methods for the fair and efficient adjudication of this controversy because:

a.    the joinder of thousands of individual Class Members is impracticable, cumbersome, unduly burdensome, and a waste of judicial and/or litigation resources;

b.    the individual claims of the Class Members may be relatively modest compared with the expense of litigating the claims, thereby making it impracticable, unduly burdensome, and expensive (if not totally impossible) to justify individual actions;

c.    when Defendants' liability has been adjudicated, all Class Members' claims can be determined by the Court and administered efficiently in a manner far less

burdensome and expensive than if it were attempted through filing, discovery, and trial of all individual cases;

       d.     this class action will promote orderly, efficient, expeditious, and appropriate adjudication and administration of Class claims;

       e.     Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action;

       f.     this class action will assure uniformity of decisions among Class Members;

       g.     the Class is readily definable and prosecution of this action as a class action will eliminate the possibility of repetitious litigation;

       h.     Class Members' interests in individually controlling the prosecution of separate actions is outweighed by their interest in efficient resolution by single class action; and

       i.     it would be desirable to concentrate in this single venue the litigation of all Class Members who were induced by Defendants' uniform false advertising to purchase their Products.

132.    Accordingly, this Class is properly brought and should be maintained as a class action under Rule 23(b)(3) because questions of law or fact common to Class Members predominate over any questions affecting only individual members, and because a class action is superior to other available methods for fairly and efficiently adjudicating this controversy.

## CLAIMS

### FIRST CAUSE OF ACTION
### VIOLATION OF NEW YORK GBL §349
**(On Behalf of Plaintiff and New York Subclass Members)**

133.    Plaintiff repeats and realleges each and every allegation contained in all the foregoing paragraphs as if fully set forth herein.

134.    New York General Business Law Section 349 ("GBL §349") declares unlawful "[d]eceptive acts or practices in the conduct of any business, trade, or commerce or in the furnishing of any service in this state . . . ."

135.    The conduct of Defendants alleged herein constitutes recurring, "unlawful" deceptive acts and practices in violation of GBL §349, and as such, Plaintiff and the New York Subclass Members seek monetary damages against Defendants, enjoining them from inaccurately describing, labeling, marketing, and promoting the Products.

136.    There is no adequate remedy at law.

137.    Defendants misleadingly, inaccurately, and deceptively advertise and market their Products to consumers.

138.    Defendants' improper consumer-oriented conduct – including affirmative misrepresentations and the failure to disclose that the Products have or at the risk of having benzene – is misleading in a material way in that it, *inter alia*, induced Plaintiff and the New York Subclass Members to purchase Defendants' Products and to use the Products when they otherwise would not have. Defendants made the untrue and/or misleading statements and omissions willfully, wantonly, and with reckless disregard for the truth.

139.    Plaintiff and the New York Subclass Members have been injured inasmuch as they purchased products that were mislabeled, unhealthy, and entirely worthless. Alternatively,

Plaintiff and the New York Subclass Members have been injured inasmuch as they paid a premium for products that were mislabeled, unhealthy and dangerous.  Accordingly, Plaintiff and the New York Subclass Members received less than what they bargained and paid for.

140.    Defendants' advertising and the Products' packaging and labeling induced Plaintiff and the New York Subclass Members to buy Defendants' Products.

141.    Defendants' deceptive and misleading practices constitute a deceptive act and practice in the conduct of business in violation of New York General Business Law §349(a) and Plaintiff and the New York Subclass Members have been damaged thereby.

142.    As a result of Defendants' recurring, "unlawful" deceptive acts and practices, Plaintiff and the New York Subclass Members are entitled to monetary, statutory, compensatory, treble and punitive damages, restitution, and disgorgement of all moneys obtained by means of Defendants' unlawful conduct, interest, and attorneys' fees and costs.

<u>**SECOND CAUSE OF ACTION**</u>
<u>**VIOLATION OF NEW YORK GBL §350**</u>
**(On Behalf of Plaintiff and the New York Subclass Members)**

143.    Plaintiff repeats and realleges each and every allegation contained in all the foregoing paragraphs as if fully set forth herein.

144.    N.Y. Gen. Bus. Law §350 provides, in part, as follows:

False advertising in the conduct of any business, trade, or commerce or in the furnishing of any service in this state is hereby declared unlawful.

145.    N.Y. Gen. Bus. Law §350a(1) provides, in part, as follows:

The term "false advertising" means advertising, including labeling, of a commodity, or of the kind, character, terms or conditions of any employment opportunity if such advertising is misleading in a material respect.  In determining whether any advertising is misleading, there shall be taken into account (among other things) not only representations made by statement, word, design, device, sound or any combination thereof, but also the extent to which the advertising fails to reveal facts material in the light of such representations with respect to the

commodity or employment to which the advertising relates under the conditions proscribed in said advertisement, or under such conditions as are customary or usual.

146.     Defendants' labeling and advertisements contain untrue and materially misleading statements and omissions concerning its Products inasmuch as they misrepresent that the Products are safe for use and don't list that the Products contain benzene.

147.     Plaintiff and the New York Subclass Members have been injured inasmuch as they relied upon the labeling, packaging, and advertising and purchased Products that were mislabeled, unhealthy, and entirely worthless.  Accordingly, Plaintiff and the New York Subclass Members received less than what they bargained and paid for.

148.     Defendants' advertising, packaging, and the Products' labeling induced Plaintiff and the New York Subclass Members to buy Defendants' Products.

149.     Defendants made their untrue and/or misleading statements and representations willfully, wantonly, and with reckless disregard for the truth.

150.     Defendants' conduct constitutes multiple, separate violations of N.Y. Gen. Bus. Law §350.

151.     Defendants made the material misrepresentations and omissions described in this Amended Complaint in its advertising and on the Products' packaging and labeling.

152.     Defendants' material misrepresentations and omissions were substantially uniform in content, presentation, and impact upon consumers at large.  Moreover, all consumers purchasing the Products were and continue to be exposed to Defendants' material misrepresentations.

153.     As a result of Defendants' recurring, "unlawful" deceptive acts and practices, Plaintiff and New York Subclass Members are entitled to monetary, statutory, compensatory,

treble and punitive damages, restitution, and disgorgement of all moneys obtained by means of Defendants' unlawful conduct, interest, and attorneys' fees and costs.

**THIRD CAUSE OF ACTION**
**BREACH OF EXPRESS WARRANTY**
**(On Behalf of Plaintiff and All Class Members)**

154.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

155.    Defendants provided Plaintiff and Class Members with an express warranty in the form of written affirmations of fact promising and representing that the Products are safe for use and do not contain benzene as stated *supra* in paragraphs 10-17.

156.    Defendants affirmed and represented that the Products were  safe and healthy when it stated on the front of the Products  "Pure & Simple", "100% naturally sourced zinc", "Free of oxybenzone, octinoxate, PABA, parabens, dyes, fragrance," and "No Dyes, PABA."  These statements would lead reasonable consumers to believe that the Product was safe, natural and healthy and that it contains safe and natural ingredients when, in fact, the Products were contaminated with benzene as stated herein.

157.    The above affirmations of fact were not couched as "belief" or "opinion" and were not "generalized statements of quality not capable of proof or disproof."

158.    These affirmations of fact became part of the basis for the bargain and were material to Plaintiff and Class Members' transactions.

159.    Plaintiff and Class Members reasonably relied upon Defendants' affirmations of fact and justifiably acted in ignorance of the material facts omitted or concealed when they decided to buy Defendants' Products.

160.    Defendants knowingly breached the express warranties by including benzene in the Products sold to Plaintiff and the Class without properly notifying them of their inclusion in the Products.

161.    Within a reasonable time after it knew or should have known, Defendants did not change the Products' labels to include benzene in the ingredient list.

162.    Defendants thereby breached the following state warranty laws:

a.    Code of Ala. § 7-2-313;

b.    Alaska Stat. § 45.02.313;

c.    A.R.S. § 47-2313;

d.    A.C.A. § 4-2-313;

e.    Cal. Comm. Code § 2313;

f.    Colo. Rev. Stat. § 4-2-313;

g.    Conn. Gen. Stat. § 42a-2-313;

h.    6 Del. C. § 2-313;

i.    D.C. Code § 28:2-313;

j.    Fla. Stat. § 672.313;

k.    O.C.G.A. § 11-2-313;

l.    H.R.S. § 490:2-313;

m.    Idaho Code § 28-2-313;

n.    810 I.L.C.S. 5/2-313;

o.    Ind. Code § 26-1-2-313;

p.    Iowa Code § 554.2313;

q.    K.S.A. § 84-2-313;

r.      K.R.S. § 355.2-313;

s.      11 M.R.S. § 2-313;

t.      Md. Commercial Law Code Ann. § 2-313;

u.      106 Mass. Gen. Laws Ann. § 2-313;

v.      M.C.L.S. § 440.2313;

w.      Minn. Stat. § 336.2-313;

x.      Miss. Code Ann. § 75-2-313;

y.      R.S. Mo. § 400.2-313;

z.      Mont. Code Anno. § 30-2-313;

aa.     Neb. Rev. Stat. § 2-313;

bb.     Nev. Rev. Stat. Ann. § 104.2313;

cc.     R.S.A. 382-A:2-313;

dd.     N.J. Stat. Ann. § 12A:2-313;

ee.     N.M. Stat. Ann. § 55-2-313;

ff.     N.Y. U.C.C. Law § 2-313;

gg.     N.C. Gen. Stat. § 25-2-313;

hh.     N.D. Cent. Code § 41-02-30;

ii.     II. O.R.C. Ann. § 1302.26;

jj.     12A Okl. St. § 2-313;

kk.     Or. Rev. Stat. § 72-3130;

ll.     13 Pa. Rev. Stat. § 72-3130;

mm.     R.I. Gen. Laws § 6A-2-313;

nn.     S.C. Code Ann. § 36-2-313;

oo.   S.D. Codified Laws, § 57A-2-313;

pp.   Tenn. Code Ann. § 47-2-313;

qq.   Tex. Bus. & Com. Code § 2.313;

rr.   Utah Code Ann. § 70A-2-313;

ss.   9A V.S.A. § 2-313;

tt.   Va. Code Ann. § 59.1-504.2;

uu.   Wash. Rev. Code Ann. § 6A.2-313;

vv.   W. Va. Code § 46-2-313;

ww.   Wis. Stat. § 402.313; and

xx.   Wyo. Stat. § 34.1-2-313.

163.   As a direct and proximate result of Defendants' breach of the express warranties, Plaintiff and Class Members were damaged in the amount of the price they paid for the Products, in an amount to be proven at trial.

**FOURTH CAUSE OF ACTION**
**NEGLIGENT MISREPRESENTATION**
**(On Behalf of Plaintiff and All Class Members)**

164.   Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

165.   Plaintiff specifically incorporates the allegations contained in paragraphs 57 through 73 as if fully set forth herein.

166.   As alleged above, Defendants misrepresented the health and safety of their Products and omitted that the Products contained, or were at risk of containing, benzene.   These misrepresentations and omissions constituted a material fact (i.e. a consumer's decision to purchase the Products would be influenced by its health and safety and the presence of benzene).

167.    Defendants' misrepresentations and omissions were made in the course of business transactions (the marketing, advertisement, sale, and purchase of the Products) in which both Plaintiff and Defendants have a pecuniary interest.

168.    Defendants knew (or should have known) that these representations and omissions were false and/or misleading and failed to exercise reasonable care in dissemination of the information contained on its labels and in its marketing and advertising.

169.    Defendants possess superior knowledge regarding the risks involved in the production and manufacturing of their Products.  Such knowledge is not readily available to consumers like Plaintiff and Class Members.

170.    Defendants have a duty to provide consumers, like Plaintiff and Class Members, with safe products.

171.    Consumers lack the meaningful ability to test or independently ascertain or verify whether a product contains unsafe substances, such as benzene, especially at the point of sale, and therefore must and do rely on Defendants to truthfully and honestly report what the Products contain (or are at risk of containing) on the Products' packaging and/or labeling.

172.    Defendants intended that their representations and omissions would induce consumers like Plaintiff and Class Members into purchasing the Products.

173.    Plaintiff's injuries were proximately caused by Defendants' misrepresentations and omissions.  Plaintiff viewed Defendants' labels prior to purchasing the Products, and the representations that the Products were healthy and safe prompted him to purchase the Products. Had Plaintiff been aware of Defendants' misrepresentations and omissions, he would have been unwilling to purchase the Products, or to purchase them at the price that he paid.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of himself and the Class, prays for judgment as follows:

A.    Declaring this action to be a proper class action and certifying Plaintiff as the representative of the Class under Rule 23 of the Federal Rules of Civil Procedure;

B.    An Order requiring Defendants to establish a blood testing program for Plaintiff and the Class, as well as to establish a medical monitoring protocol for Plaintiff and the Class to monitor individuals' health and diagnose at an early stage any ailments associated with exposure to benzene;

C.    Awarding monetary damages and treble damages;

D.    Awarding statutory damages of $50 per transaction, and treble damages for knowing and willful violations, pursuant to N.Y. GBL §349;

E.    Awarding statutory damages of $500 per transaction pursuant to N.Y. GBL §350;

F.    Awarding punitive damages;

G.    Awarding Plaintiff and Class Members their costs and expenses incurred in this action, including reasonable allowance of fees for Plaintiff's attorneys, experts, and reimbursement of Plaintiff's expenses; and

H.    Granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues.

Dated: May 25, 2022

**THE SULTZER LAW GROUP P.C.**

By:      Jason P. Sultzer /s/

_____

Jason P. Sultzer, Esq.
Joseph Lipari, Esq.
Daniel Markowitz, Esq.
270 Madison Avenue, Suite 1800
New York, NY 10016
Tel: (845) 483-7100
Fax: (888) 749-7747
sultzerj@thesultzerlawgroup.com
liparij@thesultzerlawgroup.com
markowitzd@thesultzerlawgroup.com

David C. Magagna Jr., Esq.
Charles E. Schaffer, Esq.
LEVIN SEDRAN & BERMAN
510 Walnut Street, Suite 500
Philadelphia, PA 19106
Tel: 215-592-1500
dmagagna@lfsblaw.com
cschaffer@lfsblaw.com

*Counsel for Plaintiff and the Class*